The undersigned have reviewed the prior opinion and Award based upon the record of the proceedings before Deputy Commissioner Tamara Nance. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's opinion and Award and enters the following Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between plaintiff and defendant.
3. Defendant was a qualified self-insurer.
The parties also stipulated to the following:
a. Recorded Statement.
b. The Form 22.
c. The Form 19.
d. Plaintiff's answers to defendant's Interrogatories.
e. Documents marked Defendants Exhibit 1.
*********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. Some type of incident occurred in the injection room at the Owens Brockway packaging factory located in Hamlet, N.C. on 13 October 1991. The Industrial Commission is in the position to judge whether it believes plaintiff in whole or does not believe plaintiff in whole. The Commission cannot issue a ruling guessing at what it thought happened. Taking this into consideration, along with the several inconsistencies within plaintiff's own testimony and the many contradictions of her story by other witnesses, plaintiff's story must be rejected in whole.
Findings of fact 2-9 concern background information useful inassessing plaintiff's versions of the alleged accident.
2. Plaintiff is a forty-four year old high school graduate who went to work for defendant first in 1984 and then again in 1986. Prior to that time she worked at a fast food restaurant and at local cotton mills.
3. On 13 October 1991, plaintiff was working for defendant as an injection mold operator at a conveyor table with a bin in the injection press room.
4. The table Ms. Cobbler was using on 13 October 1991 weighs over 1000 pounds. When this table is moved around the plant, it requires a hand jack, high-lift, or two or more men (Transcript of the Evidence page 95).
5. A scale was located in plaintiff's work area on 13 October 1991. The scale weighs 113 pounds. The clearance under the scale is about 1 1/2 inches. The wheels have a diameter of 5 inches and do not swivel (Transcript of the Evidence pages 115, 128).
6. A large stack of empty cardboard boxes was located in plaintiff's work area on 13 October 1991. Each empty box weighs about 2 pounds (Transcript of the Evidence page 93).
7. On 13 October 1991, all employees were required to wear steel toed safety shoes which are about 3 inches thick from top to bottom (Transcript of the Evidence page 115).
8. Paul Aaron, Ms. Cobbler's supervisor, testified that Ms. Cobbler was "Below average in attendance and in her work habits. She missed more work than most people" (Transcript of the Evidence page 87).
9. Ms. Cobbler completed her shift normally the day of the alleged accident.
Findings of fact 10-19 set out the various testimony of theplaintiff in this case. Some of the numerous inconsistencies arehighlighted for easy-reference.
 10. Plaintiff told Dr. Waring at the Carolina Family Medicine Group on 25 October 1991 that she was injured when she was knocked down by a forklift and fell onto her buttock and hit the corner of a skid.
11. On 5 November 1991 Ms. Cobbler filled out an Employee's Report of Injury. In this report, under "Describe what happened" she wrote "Mark Beck — Let the boxes at the end of A27 with tow motor pushing them against the scales, hopper table — scalelanding on top of feet and hopper pushed on me too . . . ."
(Defendant's exhibit 1).
12. On 11 November 1991, plaintiff prepared an Employee Report of Injury which alleged an injury sustained on 13 October 1991. In that report, plaintiff stated: "scale landing on top offeet and hopper pushed on me too — could not get out from under the scale and table and he did not hear me screaming — fell on empty side of side behind me."
13. On 2 July 1992 plaintiff prepared a Form 18. In that form, plaintiff stated that "co-worker knocked over boxes which knocked her down."
14. At the original Industrial Commission hearing, plaintiff testified on direct examination that the scale "came down on myfoot," being caused to do so by the "tong" of the "fork lift" which had made the scale "flip up" (Transcript of the' Evidence page 10). In her answer to the very next question, plaintiff then states: "the scale was on top of my feet" (Transcript of the Evidence page 10).
15. At the hearing on cross examination, plaintiff testified that she was able to "straighten up" and take "one or two steps" backward before she "was down" (Transcript of the Evidence page 35).
16. At the hearing on cross examination, plaintiff testified that, after falling; "when I looked down, there was scales on top of my feet" (Transcript of the Evidence page 32). In answering a successive question, plaintiff stated "when I landed the scale was on top of my foot" (Transcript of the Evidence page 34).
17. Furthermore, plaintiff added that she was able to push the scale off her "feet" before Mark Beck arrived (Transcript of the Evidence page 38).
18. On 23 August 1993, plaintiff reported to Dr. Smoot that she was injured when a forklift ran into some boxes and caused her to fall backwards. Furthermore, plaintiff reported to Dr. Smoot that she had bumped her head on the back of some boxes.
19. At the Industrial Commission hearing, plaintiff testified on direct examination that the conveyer belt, bin, and scale all were falling toward her but that: "I shoved the bin andthe conveyer-belt off me just before I hit the floor" (Transcript of the Evidence page 10). Plaintiff then claimed she "pushed real hard with her hands" (Transcript of the Evidence page 10) to accomplish this dubious feat.
Findings of fact 20-23 set out the testimony of witnessesfamiliar with the plant which casts further doubt on theplaintiff's story.
20. Paul Aaron, Ms. Cobbler's supervisor, testified at the original Industrial Commission hearing. Mr. Aaron testified that the accident could not have happened in the way Ms. Cobbler alleges. With regard to the scale going up and onto her foot (or feet): "The clearance would not allow it to go up under it. The scale weighs in excess of 100 pounds, a carton weighs two pounds. A carton falling or getting caught against it is not going to move it" (Transcript of the Evidence page 93). Regarding the bin and table falling toward Ms. Cobbler: "Your one table weighs from 1,000 to 1,500 pounds. It's not going to move it over. The other is, its base is wide enough that it would not upset it, especially if it was filled with product" (Transcript of the Evidence page 94).
21. John Mulchrone, the industrial relations director at the Owens-Illinois plant in Hamlet, also testified at the Industrial Commission hearing on 5 August 1993. Mr. Mulchrone bolstered Mr. Aaron's observations, testifying that "there is no way" the scale could have gone over plaintiff's foot because a number of two-pound boxes are not going to make that scale ride up. It's impossible" (Transcript of the Evidence page 116).
22. Similarly, John Mulchrone testified that the table plaintiff occupied could not have been moved in the way plaintiff described: "The tables weigh several hundred pounds, and they are not going to move if a box falls down on top of them." Mr. Mulchrone went on to say "The boxes will break before they move that table. They will break or they will fall down" (Transcript of the Evidence page 118).
23. Mr. Mulchrone testified further that he had never spoken to Ms. Cobbler about this alleged accident, contradicting a recorded statement by plaintiff that he had (Transcript of the Evidence page 118).
Findings of fact 24-32 contrast specific assertions made byplaintiff and direct refutations of these assertions by otherwitnesses.
24. Plaintiff testified on cross examination that she "screamed" and that Mark Beck was the only person to respond, notwithstanding the fact that there were several other people with her in the injection room. Plaintiff further testified that Mark Beck responded to her "right then" (Transcript of the Evidence page 37).
25. Mark Beck testified that he "did not" hear a scream at the time of the alleged injury (Transcript of the Evidence page 75).
26. Plaintiff testified on cross examination that her work area had become a "pretty big mess while she was down, because the conveyer continued to spew forth products (Transcript of the Evidence page 36).
27. Plaintiff also testified on cross examination that Paul Gibson, Ronnie Crouch, and Marjorie Maynard helped her to clean up a large amount spilled product in the work area (Transcript of the Evidence page 39). None of these witnesses, however, were present at the hearing.
28. Mark Beck did testify at the hearing, and contradicts plaintiff's description of her work area. When he reached plaintiff's work station, Mark Beck observed a "typical" work station (Transcript of the Evidence page 76). Furthermore, he saw nothing on the floor besides the toppled boxes (Transcript of the Evidence page 77) and said that "It looked like it normally looks in the injection department — (Transcript of the Evidence page 78).
29. Moreover, Mr. Aaron testified about Ms. Cobbler's immediate work area: "There was no cartons scattered around or parts scattered around" (Transcript of the Evidence page 90).
30. Plaintiff testified that she had never seen Paul Aaron at the scene of the alleged accident that day (Transcript of the Evidence page 39).
31. Mr. Aaron went on to testify that, on 13 October 1991, at approximately 3:00 p.m., Mark Beck came to his office and reported that Ms. Cobbler had been involved in an accident (Transcript of the Evidence page 90).
32. Paul Aaron testified further that he immediately went to her work area and asked her if there was a problem. She responded "no" (Transcript of the Evidence page 90). He estimated it took him two or three minutes to reach Ms. Cobbler (Transcript of the Evidence page 91).
Findings of fact 33-36 lay out the testimony of Mark Beck,the tow-motor driver in the alleged accident.
33. Mark Beck testified that, with the tow motor "idling", he had "nudged" a seven-foot tall stack of boxes at floor level (Transcript of the Evidence page 74).
34. Mark Beck then stated that "four to seven" boxes fell off the top of the stack toward Ms. Cobbler's work area. He did not here a scream when the boxes fell and completed some quick paperwork before going to retrieve the fallen boxes. Mr. Beck estimated that "three minutes at the most" had elapsed before he reached Ms. Cobbler, and that he was the only one with Ms. Cobbler at that time (Transcript of the Evidence pages 75-76).
35. Mr. Beck went on to testify on direct that Ms. Cobbler told him at that time that she "had fell". (Transcript of the Evidence page 78).
36. Besides the factual inconsistencies, contradictions and credibility questions, many questions are raised in reviewing the medical testimony and records of this case.
Findings of fact 37-39 articulate troubling questions aboutMs. Cobbler's doctor, Dr. George Ferro.
37. Ms. Cobbler was under the care of Carolina Family Medicine prior to and just after the alleged accident on November 4, 1991, however, she then set out for a new doctor, finding Dr. George Ferre. Her change of doctors coincided with her former physicians' suggestion that she return to work.
38. Dr. Ferre voluntarily deactivated his South Carolina medical license in 1991 after a complaint was filed against him alleging that he had performed back surgery on seven patients without documented medical justification.
39. One of the deposed doctors, Daniel C. Hall, practices in the same geographical area as Dr. Ferre. Dr. Hall testified that he does not refer patients to Dr. Ferre because he does not think Dr. Ferre is qualified. Multiple patients have told Dr. Hall that Dr. Ferre has performed unnecessary surgery on them (Hall Deposition pages 22, 23).
Findings of fact 40-46 set out disagreements between Dr.Ferre and the other deposed doctors with regard to plaintiff'sclaim of Carpal Tunnel Syndrome.
40. Dr. Ferre diagnosed Ms. Cobbler with Carpal Tunnel Syndrome caused by a "bilateral double crush" suffered during the alleged fall. Key symptoms of this disease were not apparent before Dr. Ferre's surgery, however, and key tests were not performed or recorded.
41. Dr. Ferre had not recorded a Tinnel or Phalen test result to confirm his positive Carpal Tunnel Syndrome diagnosis, even though he claimed to have done the test (Ferre Deposition page 82). Earlier in the deposition, Dr. Ferre stated: "What I usually do, my way of — writing reports is that I will write positive results, but I don't go into every negative thing I do" (Ferre Deposition page 8).
42. Ms. Cobbler reported to Dr. George Sadler Edwards (another of the deposed doctors) that she began to experience paresthesia in both hands, right greater than left, one to two weeks after her accident in October of 1991. This assertion is absent, however, from all medical records until after her first Carpal Tunnel Syndrome release in June of 1992.
43. Until the day of surgery (25 June 1992), any mention of numbness in Ms. Cobbler's right hand or wrist is also absent from Dr. Ferre's medical records.
44. Dr. Edwards testified that "certain physical examinations should have been done as well as an EMG/nerve conduction study to determine whether the cervical disk problem was truly affecting the hands (Edwards Deposition pages 14, 20).
45. Dr. Edwards disagrees with Dr. Ferre's diagnosis. Dr. Edwards testified that Ms. Cobbler's bilateral Carpal Tunnel Syndrome was not caused by her neck problem (Edwards Deposition page 7). Dr. Edwards thought "it would be difficult for a fall landing on the buttocks to cause a ruptured disk that would then, in turn, cause bilateral carpal tunnel syndrome" (Edwards Deposition page 8).
46. After looking at the MRI of the plaintiff, Dr. Edwards strongly disputes Dr. Ferre's diagnosis: "Based on that, I would state that it would be unlikely that this would cause a double crush and would be virtually impossible to cause a bilateral double crush" (Edwards Deposition page 30).
Findings of fact 47-49 set out disagreements between Dr.Ferre and the other deposed doctors with regard to the allegedHerniated Nucleas Pulpus of C-5 and C-6.
47. Dr. Ferre was the only deposed doctor who diagnosed Ms. Cobbler with a Herniated Nucleas Pulpus of C-5 and C-6.
48. In Dr. Ferre's diagnosis and treatment of HNP of the C-5, C-6, he placed more emphasis on Ms. Cobbler's subjective reports of pain than he did on the objective test results. He explained himself by saying: "so the bottom line in spinal surgery is that you treat the patient, you don't treat the test" (Ferre Deposition page 16).
49. Dr. Gary L. Smoot (another deposed physician), after viewing the MRI scan dated 3 March 1992, expressly disagrees with Dr. Ferre's diagnosis of a Herniated Nucleus Pulposis at C-5, C-6: "I wouldn't call that a Herniated Nucleus Pulposis" (Ferre Deposition page 28).
Findings of fact 50-51 set out disagreements between Dr.Ferre and the other deposed doctors with regard to allegedpressure and degeneration shown on the cervical MRI scans.
50. Dr. Ferre was also alone among the deposed doctors in seeing increasing pressure and degeneration on the cervical MRI scans.
51. Dr. Hall treated Ms. Cobbler prior to and just after her alleged injury. He ordered cervical x-rays and made his diagnosis in late October of 1991. Dr. Hall testified that "[t]hese films showed no soft tissue abnormalities. They showed no abnormalities of any kind. No bony abnormalities, no soft tissue abnormalities (Hall Deposition page 14).
Findings of fact 52-53 set out disagreements between Dr.Ferre and the rest of the deposed doctors with regard to analleged "questionable cervical fracture."
52. Dr. Ferre was alone among the deposed doctors in seeing a "questionable cervical fracture" on her plane film.
53. Dr. Smoot expressly stated that he did not observe a "questionable cervical fracture" on the plane x-ray (Smoot Deposition page 12).
Finding of fact 54 outlines a further diagnosis of Dr. Ferrewhich would seem to cast doubt on the source of `plaintiff'spain.
54. Dr. Ferre also has diagnosed Peggy Cobbler with "hemalgia. This disease is described by Doctor Ferre as "pain where the blood flows" (Ferre Deposition page 73). Dr. Ferre went on to testify that "Peggy Cobbler has ill-defined kind of pain. She's not someone that you would insert in a football lineup" (Ferre Deposition page 73).
Findings of fact 55-59 set out the testimony of variousdeposed doctors and their doubts as to Ms. Cobbler's truthfulness.
55. There is also reason to question the veracity of Ms. Cobbler's communications to her doctors. Doctors Smoot and Edwards expressly questioned the pain complaints of Ms. Cobbler.
56. Dr. Smoot reviewed the plane cervical films taken of the plaintiff in October 1991 and the MRI cervical scans taken in November of 1992. After looking at these tests, Dr. Smoot testified "I haven't seen anything so far that would definitely say that it would cause any kind of neurologic symptoms. Pain can be a possibility; though with such normal disk hydration, it is probably not likely" (Smoot Deposition page 15).
57. Dr. Smoot went on to testify that further tests (including a personality test) would be needed to assess whether surgery was needed in this case: "Sometimes people will tend to somaticize emotional distress as physical symptoms' (Smoot Deposition page 18).
58. Dr. Smoot went on to further question the plaintiff's pain complaints in this case. Ms. Cobbler, as reflected in a letter written by Dr. Ferre, reported of pain that "switches from leg to leg" (Smoot Deposition page 26). Dr. Smoot, after indicating that this does not make sense, testified "there is no strong medical reason for that to occur" (Smoot Deposition page 26).
59. Finally, Dr. Edwards testified at the deposition that he thought it possible that Ms. Cobbler was "embellishing" her Symptoms (Edwards Deposition pages 31-32).
60. Plaintiff failed to prove by the greater weight of theevidence that her medical problems, if any, were the result of analleged accident that took place 13 October 1991 at defendant'splace of employment.
*********
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSION OF LAW
1. Plaintiff did not sustain an injury by accident arising out of and in the course of her employment with defendant employer on 13 October 1991.
*********
Based on the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
AWARD
1. Plaintiff's claim must under the law be and is hereby DENIED.
2. Each party shall pay the appropriate share of costs due this Commission.
 S/ __________________ ROGER L. DILLARD, JR. DEPUTY COMMISSIONER
CONCURRING:
S/ ________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ ________________ J. RANDOLPH WARD COMMISSIONER